**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** Plaintiffs,

**People of the State of New York, by Eliot Spitzer, Attorney General of the State of New York, Plaintiffs–Intervenors,**

v.

**FEDERAL EXPRESS CORPORATION,** Defendant.

No. 01–CV 4366 NGG.

United States District Court, E.D. New York.

June 17, 2003.

Andree Peart, Michael B. Ranis, Equal Employment Opportunity Commission, New York City, for Plaintiffs.

Brian J. Kreiswirth, NYS Attorneys Generals Office, Tynia Denise Richard, Attorney General of the State of New York, New York, NY, for Plaintiffs–Intervenors.

Traycee E. Klein, Epstein Becker & Green, P.C., New York City, for Defendant.

## MEMORANDUM & ORDER

GARAUFIS, District Judge.

On September 16, 2002, the court issued a Memorandum and Order denying Defendant Federal Express Corporation's ("FedEx") motion to dismiss against the Attorney General of the State of New York ("OAG") and granting FedEx's motion to dismiss against the Equal Employment Opportunity Commission ("EEOC"). Fe-

dEx and the EEOC now move the court to reconsider those decisions pursuant to Local Rule 6.3. For the reasons set out below, these motions are denied.

## DISCUSSION

### I. Local Rule 6.3

■ Local Rule 6.3 provides in pertinent part: "There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." Thus, to be entitled to reargument and reconsideration, "the movant must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion." *Wiesner v. 321 West 16th St. Assocs.*, 2000 WL 1585680, *2 (S.D.N.Y.2000) (citing *Ameritrust Co. Nat'l Ass'n v. Dew*, 151 F.R.D. 237, 238 (S.D.N.Y.1993)); *East Coast Novelty Co. v. City of New York*, 141 F.R.D. 245, 245 (S.D.N.Y.1992).

■ Local Rule 6.3 is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court. In deciding a reconsideration and reargument motion, the court must not allow a party to use the motion as a substitute for appealing from a final judgment. *See Morser v. AT & T Info. Sys.*, 715 F.Supp. 516, 517 (S.D.N.Y.1989); *Korwek v. Hunt*, 649 F.Supp. 1547, 1548 (S.D.N.Y.1986), *aff'd*, 827 F.2d 874 (2d Cir.1987). Therefore, a party may not "advance new facts, issues or arguments not previously presented to the Court." *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.*, 768 F.Supp. 115, 116 (S.D.N.Y.1991). The decision to grant or deny the motion is within the sound discretion of the district court. *See Schaffer v. Soros*, 1994 WL 592891, at *1 (S.D.N.Y.1994).

### II. FedEx's Motion For Reconsideration

#### A. OAG's Authority To Prosecute Title VII Actions Under New York State Law

■ FedEx first argues that the court erred in finding that the OAG has authority to bring discrimination cases on behalf of the People of New York.[1] In support of this assertion, Defendant correctly notes that the OAG's authority to prosecute a legal action arises only by statute. FedEx then puts forward several spurious arguments that purportedly demonstrate that the OAG lacks authority to prosecute this case. First, Defendant asserts that the OAG's authority to prosecute legal actions is limited by New York Executive Law § 63(3), which provides:

> The attorney-general shall ... [u]pon request of the governor, comptroller .... or the head of any other department, authority, division or agency of the state, investigate the alleged commission of any indictable offense or offenses in violation of the law which the officer making the request is especially required to execute or in relation to any matters connected with such department, and to prosecute the person or persons believed to have committed the same and any crime or offense arising out of such investigation or prosecution or both, including but not limited to appearing before and presenting all such matters to a grand jury.

N.Y. Exec. L. § 63(3). Contrary to Defendant's assertions, this statute merely obli-

---

1. This finding was implied in the court's Memorandum & Order dated September 16, 2002. However, as the court did not squarely address this issue in that Memorandum, I find that the issue has been properly presented in this motion for reconsideration.

gates the OAG to act as the legal arm of the state. Where departments of the state government request the OAG to investigate and prosecute violations of the law, § 63(3) commands the OAG to do so. Nothing in the statute appears to limit the authority of the OAG to prosecute discrimination cases under the OAG's primary enabling provision, § 63(1). That section confers broad authority upon the OAG to prosecute all types of legal cases by providing, in pertinent part, that the "attorney-general shall ... [p]rosecute and defend all actions and proceedings in which the state is interested." N.Y. Exec. L. § 63(1).

In a related argument, Defendant argues that under *People v. Gilmour*, 98 N.Y.2d 126, 746 N.Y.S.2d 114, 773 N.E.2d 479 (2002), the OAG may only prosecute legal actions where asked to do so by the heads of state departments and agencies. This argument completely misinterprets the holding of *Gilmour*. There, the Court of Appeals of New York considered the narrow issue of whether the OAG could prosecute a criminal action under § 63(3) where it did not receive a "request to prosecute" from the "head of any ... department [or] agency." The court held that under § 63(3) such a request could only be made by a department or agency head, and that a request made by the chief counsel of the state police was not adequate for purposes of § 63(3). *See Gilm-*

*our*, 98 N.Y.2d at 133, 746 N.Y.S.2d 114, 773 N.E.2d 479. The issue of the OAG's authority to prosecute cases under § 63(1) was not raised in front of the *Gilmour* court. As a result, the court, exercising its narrowly tailored appellate jurisdiction, did not consider the OAG's authority under that section of the Executive Law.

Many other New York courts have considered the OAG's authority under § 63(1), and all have acknowledged that § 63(1) confers broad authority upon the OAG to prosecute legal actions in which the state has an interest. *See Cliff v. Vacco*, 267 A.D.2d 731, 732, 699 N.Y.S.2d 791 (3d Dep't 1999); *Abrams v. Brady*, 143 Misc.2d 233, 540 N.Y.S.2d 145, 147 (N.Y.Sup.Ct.1989); *People v. Schwartz*, 1986 WL 55321, *8 (N.Y.Sup.Ct.1986). Here, the OAG has brought an action for religious discrimination against FedEx. As religious discrimination is clearly an issue "in which the state is interested," I find that the OAG does have authority to bring discrimination suits under § 63(1).[2]

## C. *Parens Patriae* Standing Under Title VII

FedEx next asserts that the court erred in finding that the OAG has *parens patriae* standing to intervene in this action. In making this motion, FedEx does not challenge the specific findings the court made in its Memorandum and Order of September 16, 2002.[3] Rather, FedEx avers that

**2.** Defendant also argues that the OAG implicitly admitted that it did not have authority to bring discrimination claims in 1967 when it sent the Governor of New York a proposed bill that would have given the OAG express authority to prosecute discrimination claims. There could be many reasons why the OAG proposed this bill and many reasons why the Governor decided not to press for its passage. It is therefore far from clear that the Attorney General's 1967 correspondence with the Governor constitutes an admission as to the

OAG's lack of authority to prosecute discrimination suits.

**3.** In that decision, the court held that the OAG had properly invoked *parens patriae* standing by (1) demonstrating a quasi-sovereign interest in this action, (2) alleging an injury to a sufficiently substantial segment of the population, and (3) demonstrating that individuals could not obtain complete relief through private suit. FedEx does challenge the court's finding that the OAG satisfied the third prong of the *parens patriae* analysis.

the court failed to consider the Second Circuit's recent decision in *Connecticut v. Physicians Health Services of Connecticut, Inc.*, 287 F.3d 110 (2d Cir.2002), which purportedly precludes *parens patriae* standing in this suit.

■ In *Physicians Health*, the Second Circuit considered whether state governments can invoke *parens patriae* standing to sue under § 1132(a)(3) of the Employee Retirement Income Security Act ("ERISA"). Endorsing a well-recognized rule of prudential standing, the court stated: "When determining whether a state has *parens patriae* standing under a federal statute, we ask if Congress intended to allow for such standing." *Id.* at 120. The court then found that Congress had not intended to allow *parens patriae* actions under ERISA because § 1132(a)(3) carefully listed the types of plaintiffs who could bring suit under the statute and did not name states suing in their *parens patriae* capacity. *Id.* at 121.

However, the court was careful to narrow its holding with the following qualification:

> By holding that the State lacks *parens patriae* standing because § 1132(a)(3) does not expressly provide for such standing, we do not of course intend to imply that states may only sue in their *parens patriae* capacity when a statute specifically provides for suits by states. States have frequently been allowed to sue in *parens patriae* to ... enforce federal statutes that ... do not specifically provide standing for state attorney generals.

*Id.* at 121 (quotations and internal brackets omitted). To underscore the importance of this qualification, the court noted that unlike the carefully circumscribed

standing provisions of ERISA, standing provisions in many other statutes implicitly authorized *parens patriae* standing by using language that permits any "person" who is "aggrieved" or "injured" to bring suit. *See id.* at 121 (citing *Connecticut v. Physicians Health Services of Connecticut, Inc.*, 103 F.Supp.2d 495, 509–10 (D.Conn.2000) (citing federal statutes with broad enforcement provisions)).

■ At issue here is whether Title VII's standing provision evinces an intention on the part of Congress to allow states to sue in their *parens patriae* capacity. The standing provision, codified at 42 U.S.C. § 2000e–5, authorizes civil suits by a "person claiming to be aggrieved." A related provision defines the word "person" to include "governments," "government agencies," and "political subdivisions." 42 U.S.C. § 2000e(a). When read together, these provisions clearly authorize the State of New York, as a "government," to bring suit under Title VII.

What these two provisions do not do, however, is clearly define how states can invoke standing to bring Title VII suits. Nonetheless, a review of the standing capacities traditionally available to plaintiff states confirms that Congress intended to permit *parens patriae* actions when it authorized state governments to bring suit under Title VII. In *Connecticut ex rel. Blumenthal v. Cahill*, 217 F.3d 93, 97 (2d Cir.2000), the Second Circuit held that "Plaintiff–States generally bring suit in the federal courts in one of three standing capacities: (1) proprietary suits in which the State sues much like a private party suffering a direct, tangible injury; (2) sovereignty suits requesting adjudication of boundary disputes or water rights, or (3) *parens patriae* suits in which States litigate to protect quasi-sovereign interests."

---

However, as discussed later, that argument has not been presented according to the requirements of Local Rule 6.3, and is therefore not addressed.

(citations and internal quotations marks omitted). Of these three standing capacities, it is clear that a state suing under Title VII can only invoke standing under the doctrine of *parens patriae*. The other two forms of standing have no relation to employment discrimination. This is clearly the case with respect to sovereignty suits involving border disputes, and is equally clear with respect to proprietary suits, since a state cannot suffer employment discrimination. The court therefore finds that Congress, by authorizing state governments to bring suit under Title VII, must have envisioned such suits being brought in the states' capacity as *parens patriae*.

Reading § 2000e–5 to allow for *parens patriae* standing also comports with the remedial purposes of Title VII. Congress passed Title VII with the intention of eradicating employment discrimination from the national economy. To effectuate this goal, courts have liberally interpreted Title VII's standing provision to allow for overlapping enforcement. *See e.g., Clayton v. White Hall School District*, 875 F.2d 676, 679–80 (8th Cir.1989) (holding that white woman who was not object of discrimination, but who alleged injury because of race discrimination against another, was a "person aggrieved" within the meaning of Title VII); *Stewart v. Hannon*, 675 F.2d 846, 850 (7th Cir.1982) (finding white woman who had been deprived of interracial

associations in workplace a "person aggrieved" within meaning of Title VII); *EEOC v. Mississippi College*, 626 F.2d 477, 482 (5th Cir.1980) (finding that the language, design, and purposes of Title VII require that the phrase 'a person claiming to be aggrieved' be construed to provide standing coextensive with Article III.); *EEOC v. Bailey Co.*, 563 F.2d 439, 451–54 (6th Cir.1977) (holding that white female had standing under Title VII to challenge her employee's alleged racial discrimination against blacks); *Waters v. Heublein, Inc.*, 547 F.2d 466, 469 (9th Cir. 1976) (holding that white woman who sued under Title VII to enjoin racially discriminatory employment practices was "aggrieved person" within meaning of the statute); *Gray v. Greyhound Lines, East*, 545 F.2d 169, 175 (D.C.Cir.1976) (holding that blacks who were not subjected to racial discrimination had standing under Title VII to sue over discrimination against other blacks); *Hackett v. McGuire Bros., Inc.*, 445 F.2d 442, 446 (3d Cir.1971) (holding that Title VII's term "a person claiming to be aggrieved" demonstrated Congressional intent to confer standing to the fullest extent permitted by Article III).[4]

Although these authorities do not address the precise issue of *parens patriae* standing, they do reflect a liberal standing doctrine that counsels in favor of recogniz-

---

4. In the leading case among these authorities, the Court of Appeals for the Third Circuit found that Title VII confers standing that is coextensive with Article III standing. The court justified its broad conception of Title VII standing by stating that "[t]he national public policy reflected ... in Title VII of the Civil Rights Act of 1964 ... [must] not be frustrated by the development of overly technical judicial doctrines of standing or election of remedies." *Hackett*, 445 F.2d at 446–47. This sentiment was cited with approval by the Supreme Court in *Trafficante v. Metropolitan*

*Life Insurance Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). There, the Court found that *Hacket's* rationale for construing standing broadly under Title VII applied with equal strength to standing under Title VIII, since both statutes contained similarly-worded standing provisions. *See Trafficante*, 409 U.S. at 209, 93 S.Ct. 364. While this dictum did not expressly confirm that standing under Title VII is coextensive with Article III standing, it does strongly suggest that the Supreme Court approves of *Hacket's* liberal construction of Title VII's standing provision.

ing *parens patriae* standing under Title VII.

## D. Claim Preclusion Under 42 U.S.C. § 2000e–2(n)

FedEx also claims that the OAG's suit is barred by 42 U.S.C. § 2000e–2(n), which prohibits certain classes of individuals from challenging the implementation of Title VII consent decrees. The OAG argues that the particular prohibitions contained in § 2000e–2(n) do not apply in the circumstances of this case.

On March 16, 2000, the EEOC commenced an employment discrimination action ("Georgia Action") under Title VII against FedEx in the United States District Court for the Southern District of Georgia. The EEOC alleged that FedEx had discriminated against a nationwide class of employees by enforcing its Personal Appearance Policies without regard to the employees' religious practices. FedEx and the EEOC eventually settled the case by entering into a consent decree ("Georgia Consent Decree") that required FedEx to amend its Personal Appearance Policies to include an exception for religious practices.

FedEx now asserts that the OAG, by bringing this action, is challenging an employment practice that implements the Georgia Consent Decree, and that such a challenge is barred by § 2000e–2(n). That section provides in pertinent part:

[A]n employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged.

■ At the outset, the court finds that FedEx has not properly raised this argument in its motion for reconsideration. Under Local Rule 6.3, a party may not "advance new facts, issues or arguments not previously presented to the Court." *Morse/Diesel, Inc.,* 768 F.Supp. at 116. FedEx did not raise any argument regarding § 2000e–2(n) in its underlying motion to dismiss. Accordingly, the court denies this aspect of FedEx's motion to reconsider for failure to comply with Local Rule 6.3.

■ Even if the court were to address the merits of this claim, it would conclude that § 2000e–2(n) does not bar the OAG from bringing this suit. It is absolutely clear, both from the Congressional reports that accompany § 2000e–2(n) and from the plain language of the statute itself, that § 2000e–2(n) precludes only direct challenges to consent decrees and to those practices adopted to implement the spirit of such decrees.

With respect to the legislative history, Congress expressly stated that it enacted § 2000e–2(n) to limit the effects of the Supreme Court's decision in *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). In that case, an association of white firefighters sought to enjoin implementation of two consent decrees that had settled earlier discrimination cases brought by African–Americans against a local fire department. The Supreme Court held that the association was free to challenge implementation of the decrees, which provided goals for the hiring and promotion of African–Americans in the fire department, because the association had not been party to the decrees and therefore could not be bound by them.

By enacting § 2000e–2(n), Congress broadened the preclusive scope of Title VII consent decrees for the narrow purpose of protecting such decrees from the type of collateral attacks at issue in *Wilkes.* This narrow purpose was emphasized in the House Report accompanying § 2000e–2(n). The Report stated that

§ 2000e–2(n) was intended to ensure that employers were not "left vulnerable to subsequent lawsuits by persons or groups claiming that the employer's compliance with the consent decree constituted discrimination against them." H.R.Rep. No. 102–40, pt. 1, at 49–50 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 590–91. The Report also justified Congress' decision to broaden the preclusive scope of Title VII consent decrees by noting that the Court's ruling in *Wilks* would frustrate Title VII's goal of encouraging voluntary settlements by subjecting present and future consent decrees to challenge. *See Id.* Nowhere does the Report suggest that § 2000e–2(n) bars challenges to all employment practices that fall under the scope of a consent decrees.

The plain language of § 2000e–2(n) also makes clear that it only bars challenges to consent decrees and employment practices that implement the spirit of such decrees. This is made manifest by the provision's focus on any "employment practice that *implements* and is within the scope of a litigated or consent judgment." (emphasis added). If Congress had intended § 2000e–2(n) to bar suits challenging *all* employment practices that fall within the scope of a consent decree, then it would have drafted the language of the statute to include the word "all employment practices" and omitted the word "implements."[5]

Furthermore, if the language of § 2000e–2(n) is ambiguous as to what practices may not be challenged, clarification may be found in § 2000e–2(n)(B). This subsection provides that § 2000e–2(n)'s prohibition only applies to a person who had actual notice of the proposed judgment or a "person whose interests were adequately represented by *another person who had previously challenged the judgment or order* on the same legal grounds and with a similar factual situation." 42 U.S.C. § 2000e–2(n) (emphasis added). This language, by focusing on *other challenges to the consent judgment,* strongly suggests that the focus of the prohibition contained in § 2000e–2(n) is the consent judgment itself, rather than any employment practice that falls within the judgment's scope.

For the reasons set out above, the court, if it were to reach this issue, would find that § 2000e–2(n) only bars challenges to employment practices that implement a consent decree by remedying problems that fall within the decree's scope. It does not bar challenges to employment practices that run counter to the spirit of such decrees, for such practices cannot be said to "implement" a consent decree.[6]

### E. Res Judicata

FedEx also claims that principles of res judicata preclude the OAG from maintaining this action. However, because FedEx

---

**5.** Indeed, FedEx quoted § 2000e–2(n) at least three times in its papers and each time deleted the word "implements." This practice suggests that even FedEx recognized the importance of the word and its conjunctive relation to the words that follow it.

**6.** The court also notes that § 2000e–2(n) expressly provides that it does not alter the rights of "those members of a group on whose behalf relief was sought in such action by the Federal Government." 42 U.S.C. § 2000e–

2(n)(2)(B). Here, the EEOC brought the Georgia Action on behalf of a nationwide class of individuals employed by or seeking employment with FedEx. If this class includes the OAG in its capacity as *parens patriae,* a proposition which FedEx suggests but the court rejects, then the plain language of § 2000e–2(n)(2)(B) would dictate that § 2000e–2(n) does not limit the OAG's right to bring this suit.

failed to raise this argument in its motion to dismiss, it may not raise it now.

█ Even if the court were to address the merits of this claim, it would find that principles of res judicata do not bar the OAG from bringing this suit. As an initial matter, where the EEOC has entered a consent decree without first being certified as a class representative pursuant to Fed. R.Civ.P. 23, principles of res judicata do not preclude non-parties to the EEOC consent decree from bringing suit against the same employer for the same relief. This rule is the natural corollary to the Supreme Court's decision in *General Telephone Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 326, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). There, the Court held that the EEOC can seek classwide relief under § 706(f)(1) of Title VII without first being certified as a class representative under Rule 23. The basis for this holding rested on the nature of the EEOC's role within the framework of Title VII. The Court stated:

> [the framework of Title VII] suggests that the EEOC is not merely a proxy for victims of discrimination and that the EEOC's enforcement suits should not be considered representative actions subject to Rule 23 ... Although the EEOC can secure specific relief ... on behalf of discrimination victims, the agency is guided by the overriding public interest in equal employment opportunity ... asserted through direct Federal enforcement ... When the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindi-

cate the public interest in preventing employment discrimination.

*Id.* (citations and internal quotations omitted).

*General Telephone* holds that the EEOC, charged with enforcing the public interest in eradicating employment discrimination, may bring cases on behalf of parties without first satisfying the requirements for class certification under Rule 23.[7] As these requirements were conceived to protect against the unfair application of res judicata, the natural corollary to the Court's holding is that EEOC actions brought on behalf of an uncertified class of individuals cannot preclude those on whose behalf EEOC sues from filing their own suits.[8] The Court in *General Telephone* recognized the res judicata implications of its holding when it stated: "In light of the general intent to accord parallel or overlapping remedies against discrimination, we are unconvinced that it would be consistent with the remedial purpose of the statutes to bind all class members with discrimination grievances against an employer by the relief obtained under an EEOC judgment or settlement against the employer." 446 U.S. at 333, 100 S.Ct. 1698 (citations and internal quotations omitted).

█ Even if *General Telephone* did not preclude the application of res adjudicata principles to this class of cases, FedEx could not prove the defense of res judicata in this particular case. To prove such a defense, FedEx must demonstrate that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in priv-

---

**7.** To be certified as a class representative under Rule 23, a plaintiff must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation.

**8.** Of course, the court acknowledges that res judicata principles are not entirely irrelevant to Title VII claims, but that such principles apply only to the extent provided by § 2000e–2(n) and other applicable provisions in the statute.

ity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dept. of Corrections,* 214 F.3d 275, 284 (2d Cir.2000). It is clear that the Georgia Consent Decree constitutes a final judgment on the merits. *Amalgamated Sugar Co. v. NL Indus., Inc.,* 825 F.2d 634, 639 (2d Cir.1987), *cert. denied,* 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987) (finding that a consent decree qualifies as a final judgment on the merits entitled to res judicata effect.) FedEx is also correct in asserting that the OAG's claims are substantially similar to those resolved under the Georgia Consent Decree.[9] However, the court does not agree with FedEx's contention that the EEOC, by entering into the Georgia Consent Decree, bound the OAG to the decree either as the "class representative" or "virtual representative" of New York State and its citizens.

With respect to its "class representative" theory, FedEx has failed to demonstrate that the EEOC brought an action on behalf of the State of New York or, conversely, that the OAG is a member of the class on behalf of which the EEOC brought the Georgia Action. The OAG's standing in this suit arises from its position as *parens patriae.* Its *parens patriae* standing derives not only from the interests of New York citizens, but also from the State of New York's own interests as a sovereign. This is manifest by the three-prong test for establishing *parens patriae* standing, which requires a finding of a quasi-sovereign interest. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Here, the EEOC entered the Georgia Consent Decree on behalf of indi-

viduals who are either employed or seeking employment with FedEx. FedEx has not demonstrated that the EEOC was acting on behalf of state governments. As the doctrine of *parens patriae* was designed to reflect a state's sovereign interest in effectuating its public policies, the court cannot find that the OAG was a member of the "class" of individuals on behalf of which the EEOC entered into the Georgia Consent Decree.

■ Nor can the court agree with FedEx's contention that the EEOC acted as the OAG's "virtual representative" when it entered into the Georgia Consent Decree. FedEx argues that the Second Circuit's decision in *Chase Manhattan Bank, N.A. v. Celotex Corp.,* 56 F.3d 343 (2d Cir.1995) requires application of the doctrine of virtual representation to this case. In *Celotex,* which involved a suit for property damages, the Second Circuit recognized that a person can be bound by a prior judgment "if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Id.* at 345–46. Here, however, because of the remedial purposes of Title VII and the widely recognized allowance for overlapping enforcement, *General Telephone* counsels against extending the Second Circuit's recognition of "virtual representation" to Title VII cases. *See also Colby v. J.C. Penney Co., Inc.,* 811 F.2d 1119, 1125 (7th Cir. 1987) ("virtual representation, whatever its vitality elsewhere, does not apply to Title VII.")

In addition, the court notes that the EEOC cannot be viewed as a *de facto* representative for the State of New York every time it enters into a consent order. As stated above, the EEOC does not act "merely [as] a proxy for victims of discrim-

---

9. In its Memorandum and Order of September 16, 2002, the court found that the issues presented in this case were substantially simi-

lar to those addressed by the Georgia Consent Decree. *See* Memorandum and Order, at 8.

ination," but rather brings discrimination actions "in its own name" for the enforcement of federal law and the effectuation of the public interest. *See General Telephone,* 446 U.S. at 326, 100 S.Ct. 1698. State governments do the same when bringing suit in their capacity as *parens patriae. See Snapp,* 458 U.S. at 607–08, 102 S.Ct. 3260. In seeking to effectuate their respective definitions of the public interest, it is entirely possible that conflicts of interest or differing priorities will arise. *See General Telephone,* 446 U.S. at 331, 100 S.Ct. 1698 ("Unlike the Rule 23 class representative, the EEOC is authorized to proceed in a unified action and to obtain the most satisfactory overall relief even though competing interests are involved and particular groups may appear to be disadvantaged ... The EEOC exists to advance the public interest in preventing and remedying employment discrimination, and it does so in part by making the hard choices where conflicts of interest exist.") In such cases, application of the doctrine of virtual representation would stand at odds with our system of federalism, which is not based upon a monolithic view of the public interest, but rather embraces the notion that states, in the exercise of their police power, may define the public interest with reference to the aspirations of their own citizenry.

Here, the possibility of a conflict of interest or of inadequate representation is real. For it may well be that a state with a sizable population claiming to wear dreadlocks for religious reasons would be more careful to seek specific protections for that population than would the EEOC in its bid to seek relief for religiously observant individuals of all faiths from around the nation.

### F. Parens Patriae Analysis Revisited

█ FedEx asserts that the court erred in finding that the OAG satisfied the third requirement of the *parens patriae* test set out in *People of the State of New York v. Peter & John's Pump House, Inc.,* 914 F.Supp. 809 (N.D.N.Y.1996). Under that requirement, a state seeking to invoke *parens patriae* standing must demonstrate that "individuals could not obtain complete relief through private suit." *Id.* at 812–13. Here again, FedEx offers new arguments that were not presented in its underlying motion to dismiss. Accordingly, the court denies this portion of FedEx's motion to reconsider.

The court also notes that this argument is devoid of merit. First, FedEx contends that the injunctive relief sought by the OAG in its Prayer for Relief is moot by virtue of the fact that FedEx has already changed its Personal Appearance Policies to allow for religiously observant employees to wear their hair in dreadlocks. However, the OAG disputes this factual assertion in its pleadings. (Complaint, ¶ 4.) As the court must accept the facts as stated in the nonmoving party's pleadings, this argument fails to provide a basis to dismiss under Fed.R.Civ.P. 12(b)(6).

In a related argument, FedEx asserts that the Georgia Consent Decree moots the OAG's demand for injunctive relief, and that the OAG's remaining demands for individual monetary relief cannot support the OAG's standing to bring this action as *parens patriae.* It may be that *paren patriae* standing cannot be granted where a state pursues an action to obtain individual monetary relief rather than injunctive relief. However, as noted above, the court has found that the Georgia Consent Decree does not preclude the OAG from bringing a suit for injunctive relief. Finally, FedEx argues that even if disputes remain as to enforcement of the Georgia Consent Decree, such disputes should be brought before the District Court in Geor-

gia, which retains jurisdiction over enforcement of the decree. This argument also fails to aid Defendant's motion as the court has already found that the Georgia Consent Decree does not bar the OAG from bringing this independent action.

### III. The EEOC's Motion To Reconsider

### A. Interpretation of the Georgia Consent Decree

In its Memorandum and Order of September 16, 2002, the court held that the Georgia Consent Decree precludes the EEOC from prosecuting this suit. The EEOC now contends that the court overlooked a provision in the Consent Decree that actually limits the Decree's preclusive effect and permits the EEOC to bring this suit. The relevant portions of the Consent Decree are set out below:

> *II. Non–Discrimination* ... FedEx agrees that it will not discriminate against any employee or applicant with respect to the policies and practices alleged in any of the aforesaid charges which have been filed by Mr. Abdul–Azeez....
>
> *IX. Religious Accommodation and Retaliation Policies* ... FedEx agrees to clarify its current Personal Appearance Policy ... to specifically provide that an employee with a sincerely held religious belief that prevents the employee from removing his beard, or requires a particular hairstyle, may request an exception to the policy....
>
> *XIII. Other Actions* ... The EEOC shall not commence or prosecute against FedEx any action or other proceeding based upon any claims, demands, causes of action, obligations, damages or liabilities which arise out of EEOC Charge Number 11A990062, or the investigation of this charge or this lawsuit. This Consent Decree in no way affects the EEOC's right to

process any pending or future charges that may be filed against FedEx or its owners in accordance with standard EEOC procedures, and to commence civil action pursuant to Section 706(f) of Title VII on any such charge.

Although its argument is less than well focused, the EEOC appears to argue that the last sentence in Article XIII nullifies the preclusive effect of the preceding sentence. FedEx argues that the last sentence merely preserves the EEOC's right to commence Title VII actions against FedEx for discriminatory practices other than those practices that were the subject of the consent decree.

### *(1) Interpretation of Consent Decrees*

 Courts generally interpret consent decrees in accordance with the law of contracts. *U.S. v. Broadcast Music, Inc.,* 275 F.3d 168, 175 (2nd Cir.2001). Moreover, contracts with the federal government are governed by federal common law, *see Falls Riverway Realty, Inc. v. City of Niagara Falls, N.Y.,* 754 F.2d 49, 55 n. 4 (2nd Cir.1985), which incorporates "the core principles of the common law of contract[s] that are in force in most states." *See United States v. Nat'l Steel Corp.,* 75 F.3d 1146, 1150 (7th Cir.1996); *see also Estate of Ray v. Comm'r of Internal Revenue,* 112 F.3d 194, 196 (5th Cir. 1997) (applying "general contract principles" to govern settlement agreement between the Internal Revenue Service and taxpayers).

 It is well recognized that the determination of whether a contract term is ambiguous is a question of law to be determined by the court. *See Independent Energy Corp. v. Trigen Energy Corp.,* 944 F.Supp. 1184, 1191 (S.D.N.Y.1996); *Marketing/Trademark Consultants, Inc. v. Caterpillar, Inc.,* No. 98 Civ. 2570, 1999

WL 721954, at *2 (S.D.N.Y. Sept. 16, 1999). A contract is ambiguous if it is capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Walk–In Med. Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987) (citations omitted). In contrast, language that has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion," is unambiguous. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (citations omitted).[10]

#### (2) The Georgia Consent Decree

Under the foregoing principles, the court reviews the Georgia Consent Decree to determine whether its provisions concerning preclusion are ambiguous.

In the first page of the Georgia Consent Decree, the parties and the court characterized the underlying purpose of the Decree by stating: "[t]he parties want to conclude fully and finally all claims arising out of the EEOC's Complaint ..." (Consent Decree, at 1.) Thereafter, in order to achieve this objective, the parties consented to Article XIII of the Decree, which provides that the "EEOC shall not commence or prosecute against FedEx any action ... based upon any claims, demands, causes of action, obligations ... which arise out of EEOC Charge Number

11A990062, or the investigation of this charge or this lawsuit." (*Id.* at 8.)

In its Memorandum and Order of September 16, 2002, the court found that this language precluded the EEOC from bringing any other Title VII action against FedEx for religious discrimination under its Personal Appearance Policies. The EEOC now attempts to undercut this interpretation by pointing to language which preserves the EEOC's right to bring certain types of actions against FedEx. As set out above, this language provides: "This Consent Decree in no way affects the EEOC's right to process any pending or future charges that may be filed against FedEx or its owners in accordance with standard EEOC procedures, and to commence civil action pursuant to Section 706(f) of Title VII on any such charge." (*Id.*)

After reading Article XIII in light of the express objectives of the Decree, the court finds that there is only one reasonable interpretation of the language cited by the EEOC. This language, contrary to the EEOC's assertions, merely preserves the EEOC's right to commence Title VII actions against FedEx for discriminatory practices other than those that were the subject of the Georgia Action. Any other interpretation would require the court to nullify the clear and specific language in the first sentence of Article XIII, reading it as mere surplusage. This the court declines to do.[11]

#### B. The Atlanta Office's Standing To Enter Consent Decree

The EEOC also attempts to limit the preclusive effect of the Georgia Consent

---

**10.** The foregoing principles stand among "the core principles of the common law of contract[s] that are in force in most states." *See Nat'l Steel Corp.*, 75 F.3d at 1150. They are therefore also a part of the federal common law of contracts.

**11.** This holding does not, of course, leave the EEOC without recourse to enforce the Consent Decree against FedEx. The EEOC may pursue such relief under Article X of the Decree.

Decree by arguing that its Atlanta Office lacked standing to challenge FedEx's hairstyle policy in the Georgia Action.[12] (EEOC Memorandum, at 4.) According to this argument, the Atlanta Office's purported lack of standing renders the portion of the Consent Decree governing hairstyles void for purposes of preclusion.

■■■■■■ While novel, the EEOC's argument misconstrues the nature of consent decrees. It is well settled that consent decrees are construed primarily as contracts and derive their legal force largely from the parties' voluntary agreement. See Local No. 93, Intern'l Assoc. of Firefighters, AFL–CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). As such, "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after trial." Id. at 525, 106 S.Ct. 3063. Indeed, a court may generally enter a consent decree that affords broader relief than that available at trial, so long as the consent decree affords relief that is consistent with the objectives of the statute upon which the compliant was based. Id.

Here, the EEOC's Atlanta Office may indeed have lacked standing to challenge FedEx's hairstyle policies.[13] However, this issue, at least in the context of this case, is simply not relevant to the question of whether the Atlanta Office had the capacity to enter into a consent decree that secured broader relief than that available at trial. The EEOC has not briefed the question of capacity to contract and as a result the court does not address it.

As the relief secured by the Georgia Consent Decree is entirely consistent with the objectives of Title VII, the court finds that the Decree's language precluding other actions against FedEx with respect to its hairstyle polices is valid and enforceable.

## C. Preclusion of Individual Employees' Right To Seek Damages

Finally, the EEOC contends that it would be inequitable to interpret the Georgia Consent Decree as precluding future EEOC actions challenging FedEx's hairstyle policy, since such a result would extinguish the rights of individual employees with dreadlocks who did not take part in the Georgia Action. This completely misstates the caselaw governing the preclusive effect of judgements arising from EEOC actions.

As discussed with respect to the OAG, it is well established that an EEOC action brought on behalf of a class of individuals without formal class certification under Fed.R.Civ.P. 23 does not preclude members of the class from initiating their own actions. See General Telephone, 446 U.S. at 326, 100 S.Ct. 1698. By entering the Georgia Consent Decree, the EEOC merely agreed that it would not bring any legal action against FedEx on behalf of individuals aggrieved by FedEx's Personal Appearance Policies. FedEx did not and could not enter an agreement which pre-

---

12. The EEOC failed to raise this argument in its original response papers and merely states in its Motion to Reconsider that its Atlanta Office lacked the "power" to challenge FedEx's policies concerning hairstyles. The court would normally dismiss this argument for failure to comply with Local Rule 6.1. However, in this case, the court will reach the merits of the EEOC's argument, since it has managed, perhaps inadvertently, to put forward an argument that appears to challenge the Atlanta Office's standing to bring the Georgia Action.

13. The court does not reach this question, as it is irrelevant to the preclusive scope of the Georgia Consent Decree.

cluded individuals from bringing their own individual actions. Accordingly, enforcement of the Consent Decree's provision carries no risk of injustice to individuals employees who wish to seek redress for damages and back pay.

## IV. CONCLUSION

For the reasons set out above, the court denies the motions to reconsider filed by FedEx and the EEOC.

SO ORDERED.